Are they? Yes. They're court-appointed? Yeah, but they're present. How do we know that? I know about that because I've been at your office for a long time. Devengoechea v. Bolivarian Republic of Venezuela. Mr. Pizzurro. Good morning, Your Honor. May it please the Court. My name is Joseph Pizzurro, representing the appellant Bolivarian Republic of Venezuela. The district court, in this case, in examining the complaint, held that there was a bailment agreement that was entered into in Florida, and that that bailment agreement called for performance in Florida as a matter of Florida law, not as a matter of what was in the agreement itself. And that, as a result, the court had subject matter jurisdiction based on the first sentence of 1605A2, that is, that the claim was based upon commercial activity carried on in the United States. And while we believe the court was wrong in analyzing the case under the first clause of the commercial activity exception, the court did focus in on what we believe is the primary question here, and that is, where was performance due? Essentially, as a breach of contract action, in the latest iteration of this complaint, in a story that's been going on for quite some time, that's what the plaintiffs say that they have. They have a bailment contract, and it was breached. And since the Weltover decision by the Supreme Court, the courts have uniformly analyzed breach of contract cases under the third clause of the commercial activity exception, the direct effect exception. Because what the courts have analyzed is that a breach of a contract by a foreign state is an act that occurs outside the United States. The actual breach, the decision not to perform, is one which is taken at the location of the state, which clearly is outside the United States. So then the question is whether that activity, if it's commercial, and there isn't an issue here with respect to the contract issue as to whether or not that's commercial. The question, therefore, is, was there a direct effect? And that turns entirely on the issue of where performance is due. And this is confirmed again, although it's not a contract case, by the Supreme Court's decision in OB-BB-Sax, in which the court said that in determining whether or not an action is based upon a commercial activity, the court has to examine the gravamen of the complaint. What is the act that injured the plaintiff? And in a breach of contract case, the act that injured the plaintiff is clearly the breach. So we come to the question of where was this to be performed? Now, the critical point in looking at that is the one continued and consistent allegation in each iteration of the complaint and in each of the affidavits that have been submitted by the plaintiff, the plaintiff has consistently said that he maintained possession, custody, and control of his collection while he was in Venezuela, and he turned it over. He relinquished that possession in Venezuela. It was in his first complaint. It's in his first affidavit that was submitted in connection with the application for default judgment. It's in each iteration. You can't create a bailment agreement until you have the turnover of that property, right? That's exactly correct, Your Honor. So the bailment contract had to have been created. So where does the breach occur? Well, the judge looked at Florida law to determine where's performance due. Under Florida law, and generally under U.S. law generally, the bailee can perform by making the property available to the bailor where the bailee is. And the alternative is that the bailee can return the property to the bailor at the place where the bailee obtained possession. But in the absence of an express agreement that the property would be returned to the bailor at some other point, there's no obligation to do so. So therefore, when you examine this case, there is certainly, there is no obligation on the part of Venezuela, the Republic, to return this property to the plaintiff in the United States. The obligation at most was to make it available at the place where the property had been turned over, which is indisputably Venezuela. As we pointed out in oral argument to the district court, even the plaintiffs are judicially stopped from arguing anything other than the fact that they relinquished this property in Venezuela because in opposing our motion to dismiss based on the statute of frauds because it's an alleged oral agreement. What if Venezuela had said, OK, we want to buy this stuff? Where would they have paid for it? Well, I think it's hypothetical. Where would the money have been? Well, I know, but... It abides the event as to what that agreement would have said. If the agreement had provided for payment to the plaintiff in the United States and that money had not been paid and there was a claim for breach of that agreement, that is the payment obligation, then, yes, there would have been a direct effect in the United States. Is there any evidence that the plaintiff had a bank account in Venezuela, for example? I think the record is silent on any of that, Your Honor. There's two ways, really, of looking at this, it seemed to me. One is the bailment agreement where it would... And the other way is it could be looked at as a tort of conversion. But if so, the conversion would have occurred, it seems to me, in Venezuela, too. I think that's absolutely right, Your Honor. And, in fact, the first theory that the plaintiff posited was effectively a conversion claim. Although, I mean, it seems to me also that one of the arguments, at least this is how I understood it, that is being made by the plaintiff is that there were, I mean, effectively two agreements. The first one was an agreement with Venezuela to bring the stuff down there and that Venezuela would either buy it or not buy it. And if Venezuela decided it wanted to buy it, then there would be a contract negotiated for the purchase of the items. And then the second one, which would have been the bailment. So why is it not the case that the first one was not breached? Well, Your Honor, first of all, we take issue with the fact that there was any first agreement at all because, as alleged, it says, I never would have got on the plane, but for this agreement that they would negotiate a sale or give me the property back, which is a difficult contract to have when he had the property in his pocket. So I don't quite understand the consistency of the allegation. Well, not necessarily, though, right, because he's going to a different country. He knows that when he goes to the other country, you know, I guess there's some possibility that in the absence of an agreement of the nature that was described, that the property could be stripped from him. So, I mean, to me, that actually makes complete sense that he never would have gotten on the plane in the absence of an agreement that either the collection would have been purchased or he would have been able to return to the United States with a collection. I mean, that makes sense to me. But, Your Honor, let's let's break that down then. If there was such an agreement, where was that agreement breached? That agreement was breached when the property was not returned to him in the absence of a contract consummated for the sale of the property. But the property was I mean, it seems to me the default is that the property wasn't returned in the United States. I mean, he was back in the United States. So it seems like that's where it would have been required to have been returned. Your Honor, that would be a point had he tended the property in the United States. He did not. Is that an is that agreement to reach a later agreement? And does it have enough specificity to be a contract? I don't believe so, Your Honor. And that's the position that we've taken. But it have to have to be specific enough. I don't believe that any agreement. For example, a price. Had the parties that that's that's a wholly different animal. And I would agree if the parties had come to a purchase and sale agreement in the United States, then that's a completely different type of contract. At best, they had an agreement to agree. Well, let me ask you about that. I would agree if all they had was an agreement that they were going to agree. But here there's more than that. Right. The agreement is either we will reach agreement on a sale price or if we don't, you will give me back my property. That seems pretty definite to me. The problem, Your Honor, with that, and that's just their allegation. That is their allegation. It's the latest. It's the latest. But this is a 12B6. I mean, we've got to accept. Well, it's not. It's 12B1. It's subject matter of jurisdiction and foreign sovereign immunity. It's foreign sovereign immunity. And with respect. But he alleged a Florida contract, right? I'm sorry. He alleged a Florida contract. He, well, he alleged that there was this statement upon which he relied in getting on the airplane in Orlando. That's what he, that's what he alleges. And we don't, what my point is on this is that that is not a contract which is enforceable. It's like in the Sheps case, which we've cited in the Second Circuit, where there was a visit by, I believe it was a representative or alleged to be a representative of the Austrian government in New York, sat down with the plaintiff, and they discussed whether or not there would be the purchase of some artwork. What they agreed to in New York was to continue those negotiations in Austria, where they did. And the court found that that is simply not an agreement upon which you can base a claim. And this is, at best, that's what this is. So I would agree that had the parties come to some terms, and again, even if the agreement was reached in the United States, that's not relevant. And the complaint does say that. The agreement was reached in the United States. Whether or not there is an agreement and an enforceable agreement that's reached in the United States is irrelevant to the jurisdictional issue. The jurisdictional issue turns on where was the performance obligation. And that's the... Well, I mean, there's, everybody knew the plaintiff lived in the United States, right? Well, yes, Your Honor. And, you know, there's no indication that he had any bank accounts in Venezuela. You've already told me that. That's correct, Your Honor. But there was never an agreement to purchase. So there was never an obligation expressed or implied to turn over any funds. So I think that wherever... But what he says is, I didn't just give it to him. Either they were going to give it back to me or they were going to pay me for it. That is correct, Your Honor, and he did that in Venezuela. And at best, that is a bailment. You have custody of my property until or unless we reach an agreement, at which point you have to return that property to me. And under the law applied by the judge, in Florida law, we don't have any Venezuelan law in the record on this. So I think the law that the court has to apply is Florida law. That return is to be at the place where it was tendered, and that's Venezuela. Well, what if it was a payment that had to go to Florida? I mean, that would be an act causing a direct effect in the United States, wouldn't it? If the parties had had a contract to purchase and the contract provided for payment in the United States and that payment was not made, yes, there would be a direct effect. And they had fixed a price. Exactly, Your Honor. There is no such contract. Well, but, I mean, you seem willing to imagine that they give it back, but if that happens, it happens in Venezuela, but you don't seem willing to, you know, consider the other, that if they bought it, the payment would go to Florida. Well, the reason I make the distinction, Your Honor, is because the pleading alleges the specific agreement about you'll return it to me if we don't. There is no allegation that the parties ever had a contract for the purchase. And if the parties had entered into such a contract and the contract had provided that the purchase price would be tendered in Venezuela, there would be no direct effect. Okay, Mr. Pissarro. You've saved four minutes for rebuttal. Thank you. Mr. Price. Good morning, Your Honors. Max Price on behalf of Richard David Ngoetchea, the plaintiff in the underlying case, and I want to cut to the conclusion of the matter. After reading Venezuela's pleadings and hearing argument, if we take this to its logical conclusion and this court grants their motion, the question is, what is the precedent that this court will be setting for all other foreign countries, especially countries that are One of the precedents I'm concerned about creating is the notion that just any time an American citizen goes to another country and enters into some kind of commercial relationship with a foreign sovereign, the fact that the foreign sovereign knows that they're a United States citizen and that in the absence of any evidence that they've got a bank account in the foreign country, that if they allege a breach, that that subjects the foreign sovereign to the jurisdiction of a federal court here, which has tremendous, Congress tells us through the Foreign Sovereign Immunities Act, has tremendous foreign policy implications. But that's not the facts in this case. The facts in this case is you have an individual, Richard David Ngoetchea, who has this family collection. He wants to sell it. Venezuela comes into our country under our soil, under the protections of our law, and they do enter into a binding contract with them. What is that contract? The binding contract is this. Look, we want to buy. He says, I want to sell. They say, great. Do they have a price? They don't have a price, and that's not where they're at yet. We'd like to see it. Why don't you come down to Venezuela and show it to us, right? No, the idea is we're interested, but we need to examine it. We need to look at the providence of the collection. We need to authenticate it, and once we do that, we'll do one of two things. We'll either buy it from you, or if we find out it's not what we think it is or you're asking for too much, we'll send you home and we're done. And he goes to Venezuela, right? Based upon that agreement and in reliance upon it, he gets on a plane and he flies down to Venezuela. Now, at the end of the day, once he gets down there, he's down there. Is that an enforceable contract that has been breached? I mean, he's gone down there. They don't have a definite price. They haven't negotiated a price. Has he demanded its return there? No. Once he's there and they're doing the examination, he's going to return home. They summon him to the home of Hugo Chavez himself, and let's say this. And they say, would you leave the collection so we can continue the examination? Now, if he would have said no, what would have happened? Supposedly, they would have put him on a plane with his collection and he'd be back home in Florida to this day with no problems. It's dangerous business dealing with Mr. Chavez. I suspect. And I would suggest that his lifesaving answer of yes says, sure, I'll leave it with you to do further examination. Now, hold on a second. Now we're going to suggest, and this is what they suggest to you, oh, we have a whole brand new agreement. We have this bailment. And by the way, if we don't like the collection or we don't want to pay you, now you have the burden of coming back to Venezuela and asking us for it. Was that what they contemplated? The answer is no. And you have to look at the definition in this case that's, you know, even under the law that deals with bailment. And it talks about a reasonable inference of the parties. And that's part of the definition that's not only in the black labor law, but also in the case law that they ignore. What was the reasonable inference? When Richard Damon Gocha says, sure, you can continue the examination and he goes home. The reasonable inference is the original contract was going to be bound. They were either going to purchase his agreement or send it home to him. The district court ruled, did it not, that this was a bailment agreement? Exactly. And you've argued that. Well, Judge Hawkins considered it a bailment, but a bailment from the extent. And you've adopted that argument. And you're brave, as I read it. Well, to the extent that they took possession of and put it on a private jet, a Venezuelan jet, and flew it back. I would suggest a bailment was not only of the collection, but of Richard Damon Gocha himself. But a bailment agreement can't be formed, can it, until you turn over the collection. Well, yeah, he turned over the collection there. But what was that in furtherance of? Did that nullify the agreement that was made here in Orlando for them to either buy it or return it to Orlando? The fact that he left it as a courtesy, did that somehow nullify or negate the original agreement? Of course not. If that were the case, he would have said, absolutely not. I'm taking my collection home. And he would have brought it home. Mr. Price, I'm not unsympathetic to the position of your client. Sure. I'm just trying to understand what the enforceable contract here is. The enforceable contract is the original one made in Orlando where they agreed that they were going to come to an agreement that they would examine it and either buy it or return it. End of story. That's the agreement. And as far as we know, they're still examining it. Oh, no, obviously they're not. There's no agreement about a specific term in which, you know, a specific period in which they would examine it or return it. There's no agreement about what the price would be if after examination they want it. I don't see where there's enough here to say that that's an enforceable contract. As far as we know, they're still examining it. Well, again, the question then becomes one of reasonableness. Because after he left, they have examined it for the next hundred years. Would that be OK under the contract? Of course not. But that's how we know that. What's what? When? How do we know from this alleged contract how long they had? Yeah, it's like a car I recently bought from someone. I said, you look, I want to take the car into my mechanic, have him check it out. And if I want to buy it, I'll buy it. If not, I'll give it back to you. Well, it's been at my mechanics now for 10 years and maybe 100 years. And, well, did we have a contract? Well, sure, we had a contract. The contract was I would examine it if I was going to buy it. I mean, that's a bailment agreement. And if I go back and I demand my car back and the mechanic doesn't give it back to me, he's breached the agreement. He's breached it there. And I can go into court and do something about it, which is exactly how the district court had construed this here. But the problem with that is that's an agreement that's breached. And it's reached and breached in Venezuela. Well, in this instance, Judge Hutch said it is a bailment from the very beginning because they took possession of the collection. The problem with that is Florida law says otherwise. Florida law says that the agreement is formed when you turn the property over. But if we're going to apply Florida law under the bailment, the bailment clearly says you return it to the owner in the state of Florida or you pay them in the state of Florida. If you are looking at this as an agreement, which is what I understood you to be saying originally, as an agreement that either your client in Venezuela would negotiate a contract for Venezuela to buy it. Or if they didn't, that Venezuela would return the property. Why isn't it the case that when your client's not able to reach an agreement with them about the purchase of it, that the property isn't due back? The property was due back. Where? Here in the state of Florida. Why not where it was turned over? Because, again, if you go to the definition of bailment. Bailment says in certain instances. If I leave the car with my mechanic, I don't expect that he's obliged to come to my house to bring it back. I expect that I go back and ask for it. You would come back to me. The mechanic. Right. I wouldn't say, well, you're going to have to go down to the mechanic where I left it. But in this instance, though, the question is. You'd expect that you'd have to go back to the mechanic where you left the car. No. Again, I want to go back. The mechanic has an obligation to come to your house. Again, going back to the definition of bailment, it says if there's a reasonable. But did the mechanic fly you from your house with your car to the mechanics? Did you deliver it to your mechanic's airplane? Maybe it wasn't the best of examples. But in this instance, when he was in Venezuela and he was when he was in Venezuela coming home, if he would have said no to Venezuela, he would have been allowed to come home and he would have had his collection. But what their suggestion is, because he gave them the courtesy of continuing to examine it, somehow he entered into a new bailment agreement. And now he wants his collection. Right. That was their agreement. He gave them the opportunity to examine. I thought that was what you were saying earlier, that this was an agreement that they would be given an opportunity to examine it. But subsequently, when he wants to come home and they want to continue to examine it, he does that as a courtesy. But the inference there and it has to be it's an obvious. And let's put ourselves in that position. You're in Venezuela. They come to you and say, hey, would you mind leaving it with us? Now, they told me that. Oh, by the way, if you give the courtesy of leaving it with us and you go home, guess what? If we don't want it, you're going to have to manage to get yourself on a plane and come back and get it. In that instance, I would say, heck no. Give me I'm leaving now and I'm taking it with me. That's why it wasn't an enforceable agreement. You didn't have those kinds of terms worked out. What was going to happen? Then you would agree with me that this theory of bailment that they're trying to sell you on down in Venezuela isn't an agreement. It wasn't an agreement. He left it as a courtesy. I think there is a bailment agreement here when you turn your property over to somebody else. Well, Huck saw that. And if you demand it back, I think they're obliged to give it back to you. Big problem, though. Big problem. You turned it over in Venezuela and you'd have to ask for it back in Venezuela. Yeah, but him allowing them to continue to look at it was only in furtherance of the original agreement here in the state of Florida in which they were either going to buy it or return it to him. And that's a reasonable inference he had when he agreed in Venezuela to let them to continue to examine. If he thought he was entering into a brand new agreement that would now require him at his expense to fly back to Venezuela and try to get it. Clearly, he would have said, no, I'm taking my collection home with me. They didn't have a specific agreement about where it would be returned. It's, you know, see, this agreement to agree problem has all kinds of undefined terms. And, Judge Pryor, I would disagree with you because Judge Huck looked at that analysis quite clearly. And to the extent they did have an agreement here in the state of Florida, the applicable law was the law of the state of Florida. State of Florida, even though the agreement of the parties was silent, the state of Florida. Judge Huck said it was a bailment agreement. But he said in the state of Florida law applies and the law of the state of Florida says you must return it to the person in Florida. That agreement is actually formed in Venezuela because that's where you turn the property over. Judge Huck did not say the bailment agreement was down. I know that's because he misunderstood Florida law about bailment. Well, and again, then the question is, did they have an agreement here in the state of Florida, a binding contract? We're going to buy it. I'm going to sell it to you. And here's our agreement. Here's our contract. You get to examine it. And if you want to buy it, we'll then negotiate a price. Or if we can't come up to a price or you're not going to buy it, I get it back. That's not a contract. That's not a meeting of the minds. If that's not a contract, I don't know what is. I don't know what it is. But here's the here's the concept that we had a lawyer who didn't understand contract law. Well, here's the here's the consequence of that is now every country out there that wants to do harm to American citizens. If you go with this, have a license to come into the state of Florida, come into the United States, go to any American citizen and say, hey, you know, we're really interested in buying some of those assets. Look, why don't you come into our country? We're going to examine it there. You know what? It's an open license. Well, you know, with a kind of ruling like that, we're opening the door to our country to allowing disreputable countries to come in here and do damage to our people. Is that the Congress has told us Congress has passed a law that that recognizes that there are situations where our citizens might, in fact, be injured by foreign sovereigns. And our courts aren't open to do anything about it. You know, I think this country's statement in the Araya case was right on the money. And it said this and it was dealing with the clause three case. And it says, moreover, in evaluating direct effects, we ask, was the effect efficiently direct and sufficiently in the United States? The Congress would one had wanted an American court to hear this case. And what Richard David Goethe is coming in and saying is I want this case heard here in Florida, in the United States, because I came to an agreement with Venezuela in this country that they would look at the antiquities and they would either buy it from me or they'd give it back to me. And I entered that here in Florida under Florida law, which should be binding to that agreement. I have no further. Thank you. Mr. Pazurro, you've saved four minutes for rebuttal. Thank you, Your Honor. Let me make a couple of points in response to counsel. First of all, on the parade of horrors of Americans being mistreated and duped by foreign foreign states. Mr. Devenger could have protect himself. Mr. Devenger could have entered into an agreement in Florida which specified that in the event we weren't able to consummate a sale, you would return it to me in Florida. If he had gotten that agreement, then he'd be fine in terms of jurisdiction. But he didn't. And that's on Mr. Devenger chair. It's not on the Republic of Venezuela under the structure of the Sovereign Immunities Act. I also I think I don't think I necessarily need to remind the court about this, but this is not a merits determination here. And we can all have our own view as to what the equities are. This is a jurisdictional determination. And it's more than that. It is foreign sovereign immunity, which has a special place in terms of that jurisdictional analysis. As the Supreme Court has made clear in all of its recent decisions on this, including the most recent one, which is the Hemmerle campaign case, which just came down about a month and a half ago or two months, two months and a half ago. There was a a intimation. I think that counsel referred to the plaintiff's decision to leave the collection with the Venezuelans as a lifesaving decision. So it seems sounds to me, although there isn't any allegation anywhere in this case of any kind of duress, it's it's been implied. And just let me say, first of all, not only is there no allegation that at all, but to the extent that it's consistent with anything in this case, it's consistent with the original pleading in the case, which was that this was an expropriation. And when we pointed out to the court that there is no jurisdiction here based on the expropriation clause of the expropriation exception 160583, because the property or property exchange for it is not in the United States, this became a commercial activity case and no longer was an expropriation case. So I don't think it's it's fair for counsel to be jumping from one theory to another, depending on whether or not it's going to tug on the heartstrings or he believes it would of a particular judge or panel. Finally, just let me state that counsel said that it was a reasonable expectation of the plaintiff that the property would be returned to him in the United States. It's irrelevant whether it's true or not, and there is no allegation in the complaint. And by the way, to one of Judge Martin's earlier questions, in paragraph 23 of the operative complaint, it is specifically alleged that there was no purchase agreement ever reached. So in terms of the hypothetical we were talking about, the plaintiff has taken that out of the case by specifically alleging that there never was any such agreement. And again, we believe that the case hinges upon the fact that this plaintiff retained the possession of his collection. When he left the United States, he retained the possession and control of it while he was in Venezuela. He voluntarily turned it over pursuant to a request, and that has been characterized as a bailment. The bailment could only come into effect when the property was turned over as a matter of Florida law, which is the law we're all operating under here. And the obligation to return it, therefore, is an obligation that was incurred in Venezuela, and there can be no jurisdiction under the Sovereign Immunities Act. We ask that the court reverse the decision below. Thank you, Your Honor. Thank you, Mr. Pizzurro. Court is adjourned for this week.